**FLORIDA POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 80–5259.

United States Court of Appeals, Fifth Circuit.*

Unit B

Nov. 6, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Robert T. Hall, III, Richard M. Merriman, Floyd L. Norton, IV, Washington, D.C., for Florida Power & Light Co.

Jane Murphy, Washington, D.C., for Federal Energy Regulatory Commission.

Spiegel & McDiarmid, Robert A. Jablon, Washington, D.C., for intervenors "Florida Cities" (Gainesville, Homestead, Key West, Kissimmee, St. Cloud, Starke, et al.)

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

The question petitioner Florida Power & Light Company ("FP&L") asks us to answer is whether the Federal Energy Regulatory Commission ("Commission") has the authority to compel FP&L to file a tariff including an FP&L policy relating to the availability of electric transmission service. FP&L's position is that filing such a tariff in effect would require FP&L to offer electric transmission service to all customers and would convert it into a common carrier for such service. FP&L argues that this amounts to compelled wheeling, which is beyond the authority of the Commission.[1] The Commission, supported by the intervenors,[2] counters that no wheeling has been

---

1. Wheeling may be defined as the "transfer by direct transmission or displacement [of] electric power from one utility to another over the facilities of an intermediate utility." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 368, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973).

2. The intervenors are City of Gainesville, City of Starke, City of Homestead, City of Kissimmee, City of St. Cloud, City of Key West, City of Tallahassee, The Ft. Pierce Utilities Authority, The Lake Worth Utilities Authority, The New Smyrna Beach Utilities Commission, and

compelled at all and that it has merely enforced a provision of its regulations specifying the information to be included in rate filings. FP&L's grievance arises out of two orders which were issued as a part of a larger, and still on-going, proceeding. Docket No. ER78–19, et al.[3] We conclude that FP&L has in effect been made to assume common carrier status and that the Commission had no authority to order the tariff and policy be filed. Therefore, we reverse.

## I. FACTS

FP&L is the largest electric utility in the State of Florida with a service area predominantly in the eastern and southern parts of Florida. Together with Florida Power Corporation, Florida's second largest electric utility, FP&L's transmission facilities cover nearly all of peninsular Florida. Use of these transmission facilities is frequently necessary for smaller municipally and cooperatively owned utilities, such as intervenors, to obtain electric power to supplement their own production or to obtain base-load power more economically than could be produced by the smaller utilities.

The need for smaller utilities to have access to transmission service has increased in recent years and, for some, economic survival may depend on such access.

In May, 1978, FP&L filed a rate schedule for interchange transmission service for the municipal utility of Homestead, Florida.[4] Shortly thereafter, FP&L filed a second such rate schedule for the municipal utility of Fort Pierce, Florida.[5] These rate proceedings were consolidated with the pending proceeding in Docket No. ER78–19, et al.

On June 6, 1978, the Commission staff moved to compel FP&L to file amended schedules governing the interchange transmission service provided to Homestead and Fort Pierce. The staff requested that the schedules be modified to include a company policy, enunciated by an FP&L vice president, Mr. Ernest Bivens, regarding the availability of transmission services.[6] This statement of policy was sworn, prepared testimony filed in Docket No. ER77–175 as rebuttal to certain staff assertions that FP&L had unduly discriminated among potential users of its transmission services.[7]

The Sebring Utilities Commission. All are cities in Florida with municipal utilities or the municipal utility commission for various Florida municipalities.

**3.** Proceedings in Docket No. ER78–19, et al., were initiated in October, 1977, when FP&L filed proposed limitations on the availability of firm wholesale requirements service, together with notices of cancellation of such service to specified wholesale customers, and proposed increases in the rates for this wholesale requirement service. Docket No. ER78–19, et al., was bifurcated into Phase I, dealing with the tariff availability restriction and the cancellation of service, and Phase II, dealing with the increase in rate. The two orders which we review on this petition are not essential parts of either Phase I or Phase II, and touch on matters subsidiary to the questions of those Phases. Before issuing the two orders now under review, the Commission issued its Phase I decision in Opinion No. 57, Opinion and Order Reversing Initial Decision and Rejecting Tariff Availability Limitations and Notice of Cancellation, 32 Pub.U.Rep. 4th [PUR] 313 (Aug. 3, 1979), rehearing denied Opinion No. 57–A, Opinion and Order Denying Rehearing Issued (October 4, 1979), appeal dismissed *sub nom. Florida Power & Light Co. v. FERC*, No. 79–

2414, (D.C. Cir., April 25, 1980). An initial decision was issued by an administrative law judge in Phase II on July 24, 1980. At the time briefs were filed in the instant petition, the Commission had yet to issue an opinion with respect to Phase II.

**4.** Docket No. ER78–325.

**5.** Docket No. ER78–376.

**6.** The staff did not request that the schedules be filed as a tariff. (Joint Appendix ["JA"], pp. 2077–79).

**7.** Docket No. ER77–175 is a proceeding arising from a proposed rate offered by FP&L for long-term transmission service to the Utilities Commission of New Smyrna Beach, Florida, under which FP&L would transmit New Smyrna's owned share of power and energy from Florida Power Corporation's Crystal River No. 3 nuclear unit. Because of differences between this transmission service and that offered to Homestead and Fort Pierce and differences in supporting data, Docket No. ER77–175 was not consolidated with Docket No. ER78–19, et al. An initial decision in Docket No. ER77–175 was issued November 28, 1978, and at the time the

Mr. Bivens listed four criteria on which FP&L conditions the availability of transmission services:

> Q. Does the failure of FPL to file a generally applicable transmission tariff reflect any intention by FPL to preclude neighboring utilities from obtaining transmission service?
>
> A. Most emphatically not. We are willing to provide transmission service when:
>
> 1. The specific potential seller and buyer are contractually identified;
>
> 2. The magnitude, time and duration of the transaction are specified prior to the commencement of the transmission;
>
> 3. It can be determined that the transmission capacity will be available for the term of the contract; and
>
> 4. The rate for such service is sufficient to compensate FPL for its costs.

(J.A. p. 2207, quoting from Docket No. ER77–175, transcript p. 118). The staff further requested that FP&L be required to include this statement of policy in all future transmission service agreements.

The Commission deferred action on the staff motion for approximately a year and a half. During the interim, FP&L filed 16 additional interchange transmission service schedules, each of which was accepted for filing, suspended, and consolidated into Docket No. ER78–19, et al.[8] Some of these filings were to amend previously filed rate schedules. Each of these schedules provided for interchange transmission service at the identical, postage-stamp rate,[9] with supporting evidence based on cost data from the same 1978 test year.[10]

The Commission granted the staff's motion in an order issued December 21, 1979.[11] The Commission ordered FP&L to "file a tariff, in substitution for the 18 separate filings..., incorporating the provisions of the several transmission service agreements at issue, including the four criteria governing FP&L transmission service availability which were recited in the testimony of Mr. Ernest Bivans in Docket No. ER77–175...." (J.A., p. 2212). The Commission justified the requirement that a tariff be filed in lieu of individual agreements on several grounds. The objectives of Section 205(c) of the Federal Power Act ("FPA"),

---

briefs were filed in the instant petition, the Commission had not yet reviewed that initial decision.

**8.** The additional 16 schedules are as follows:

| Docket | Customer |
| --- | --- |
| ER78–478 | Lake Worth, Florida |
| ER78–508 | Tampa Electric Co. |
| ER78–527 | Homestead, Florida |
| ER78–566 | Vero Beach, Florida |
| ER78–567 | Tampa Electric Co. |
| ER79–44 | Tampa Electric Co. |
| ER79–162 | Homestead, Florida |
| ER79–171 | Ft. Pierce, Florida |
| ER79–172 | Ft. Pierce, Florida |
| ER79–352 | New Smyrna Beach, Florida |
| ER79–452 | Jacksonville, Florida |
| ER79–522 | Ft. Pierce, Florida |
| ER79–554 | New Smyrna Beach, Florida |
| ER79–563 | Lake Worth, Florida |
| ER79–574 | Florida Power Corp. |
| ER80–8 | New Smyrna Beach, Florida |

FP&L attacked the Commission's suspension order in four of the interchange transmission schedules consolidated, namely, Docket Nos. ER78–325, 478, 508 and 566. The District of Columbia Circuit has upheld these suspension

orders. *Florida Power & Light Co. v. FERC*, 617 F.2d 809 (D.C.Cir.1980).

**9.** The FERC's brief defines a postage stamp transmission rate as the same unit rate per kilowatt, regardless of distance, based on the average cost of wheeling power anywhere over a transmission network. (FERC brief, p. 6).

**10.** FP&L asserts in its brief that there were variations in the services provided under the agreements. For example, some agreements provided for emergency service for 72 hours, while the Homestead and Ft. Pierce agreements provided for emergency service for 30 days. (FP&L initial brief, p. 8.) The Joint Appendix does not contain copies of these agreements, but none of the parties contest this characterization. The Commission found the service agreements "similar."

**11.** Order Directing the Submission of a Transmission Tariff in Substitution for Individual Rate Schedules, Docket No. ER78–19, et al., issued December 21, 1979.

16 U.S.C.A. § 824d(c) (West 1974),[12] and Section 35.2 of its Regulations, 18 C.F.R. § 35.2 (1980), as well as administrative efficiency, would better be served with a single tariff than by the maintenance of numerous service agreements. The similarity of the filed agreements and the proximity of the filing dates indicated that, as a matter of fact, the policy of availability did control FP&L's decision of whether to grant requested transmission. Also, because a postage stamp rate is involved with each individual agreement, FP&L would be required in the future to demonstrate that any service at a different rate to a new customer would not be unduly discriminatory, making the filings a tariff service in substance.

FP&L had objected vociferously to the Commission's requirement that Mr. Bivans' statement of policy be included in the tariff. The Commission held that this policy statement was a "practice" within the meaning of § 205(c) of the FPA and § 35.1(a), 18 C.F.R. § 35.1(a) (1980), of its regulations. It concluded that because FP&L intended the Commission to rely on this policy statement in Docket No. ER77–175, FP&L should have anticipated these availability criteria would be published and given effect. Because the policy statement was from FP&L itself, the inclusion of the statement in the tariff would in no way expand FP&L's transmission service obliga-

tion, and thus did not amount to compelled wheeling.

FP&L timely filed a petition for rehearing of this order. During the interim between the original order and the Commission's decision on rehearing, FP&L filed three additional interchange transmission rate schedules.[13] The Commission similarly accepted these filings, suspended each for one day, and consolidated each with Docket No. ER78–19, et al. The Commission denied rehearing.[14] In the only amplification of the first order, the Commission refused to state whether FP&L's policy statement was one for only interchange transmission service or for transmission service in general.

## II. COMMISSION AUTHORITY TO ORDER THE TARIFF AND POLICY STATEMENT TO BE FILED

The crux of this controversy turns upon what authority the Commission has under the FPA to order the transmission of electricity, and what authority it has to control the format of its filings. We, therefore, begin with an analysis of the FPA. The FPA, as originally enacted, did not permit the Commission to compel wheeling nor did it require utilities to provide wheeling upon request.[15] The legislative history of the FPA makes clear that Congress did not intend the Commission to have power to

12. See footnote 22, *infra*, for the text of Section 205(c).

13. New Smyrna Beach, Florida, Docket No. ER80–141; Tampa Electric Co., Docket No. ER80–156; and Orlando, Florida, Docket No. ER80–199.

14. Order Denying Rehearing, Accepting for Filing and Suspending Rate Schedules and Denying Motion for Extension of Time, Docket No. ER78–19, et al., issued February 6, 1980.

15. In November, 1978, the Public Utility Regulatory Policies Act, Pub.L. No. 95–617, 92 Stat. 3136 (1978), amending the FPA, expanded the Commission's powers to include the authority to compel wheeling in certain circumstances. Under new §§ 211 and 212 of the FPA, 16 U.S.C.A. §§ 824j and 824k (West Supp. 1980), the Commission may require one utility to provide transmission services upon application of a second utility if certain substantive and pro-

cedural requirements are met. For example, under § 824j(a), an electric utility may obtain an order requiring a second utility to wheel if, after notice and a hearing it is determined that such service (1) is in the public interest, (2) conserves a significant amount of energy, significantly promotes the efficient use of facilities and resources, or improves reliability of any electric utility system, (3) is not likely to result in a reasonably ascertainable uncompensated economic loss for the transmitting utility, (4) will not place an undue burden on the transmitting utility, (5) will not unreasonably impair the reliability of the transmitting utility, and (6) will not impair the ability of any electric utility affected to render adequate service to its customers. Neither the Commission nor the Commission's counsel attempt to justify the orders now on review under these provisions since the procedures specified in the new §§ 211 and 212 have not been complied with.

compel wheeling. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 375–6, 93 S.Ct. 1022, 1028–1029, 35 L.Ed.2d 359 (1973), as well as the dissent at 383–387, 93 S.Ct. at 1032–1034, for a thorough discussion of the relevant legislative history of the FPA; *see also New York State Electric & Gas Corp. v. FERC*, 638 F.2d 388 (2d Cir. 1980), *U.S. appeal pending; Richmond Power & Light of Richmond, Indiana v. FERC*, 574 F.2d 610 (D.C.Cir.1978). Bills introduced in Congress, but never enacted, would have imposed the obligations of a common carrier upon utilities with respect to transmission of electricity.[16] The Congress refused to pass these bills and, as evidenced in the Senate Report of the FPA, chose to leave the decision on wheeling to the "voluntary coordination of electric facilities." S.Rep. No. 621, 74th Cong., 1st Sess., at 19.

■ While the Commission may not compel the transmission of electricity, it does possess the authority to review transmission contracts under § 206(a) and to make modifications of those contracts upon a determination that the terms of such a contract are unjust, unreasonable, unduly discriminatory, or preferential. *New York State Electric & Gas Corp. v. FERC, supra; Richmond Power & Light of Richmond, Indiana v. FERC*, 574 F.2d at 620. It also has the authority to review any change in such a contract under § 205. In performing these functions with respect to a wheeling contract, though, the Commission must be especially careful not to overstep its authority and require the involuntary wheeling of electricity, absent compliance with the new §§ 211 and 212 of the FPA.

In two recent cases, the courts have rejected ingenious arguments which would have established the Commission's authority to require wheeling by indirect means. In *New York State Electric & Gas Corp.*, the Commission ordered the deletion from a wheeling contract of a provision prohibiting a municipal utility from selling wheeled power outside its city limits. The Commission attempted to justify this order on the ground its order only removed a restriction on the use of wheeled power and that no wheeling was compelled. It attempted to disassociate its removal of the territorial restriction from the amount of power the wheeling utility would ultimately transmit. The Commission contended that the wheeling utility had not yet reached its full capacity allocation under the contract, and therefore, removal of the geographic restriction would not result in involuntary wheeling. The Second Circuit did not accept this analysis. Finding that the Commission's order would compel the utility to transmit an amount of power over and above that contracted for, the Second Circuit concluded that the Commission had exceeded its authority by ordering involuntary wheeling.

In *Richmond*, a utility attempted unsuccessfully to convince the Commission that rates proposed in a national, voluntary program to transmit coal-generated power from the mid-west to the oil-short east were unreasonable because the utilities had submitted rates only for voluntary wheeling. The utility argued that the Commission's authority to reject unreasonable rate proposals and to set reasonable rates included the power to condition approval of the proposed rates on involuntary wheeling. The District of Columbia Circuit concluded the Commission had acted properly, stating:

> If Congress had intended that utilities could inadvertently bootstrap themselves into common-carrier status by filing rates for voluntary service, it would not have bothered to reject mandatory wheeling in favor of a call for just such voluntary wheeling.

574 F.2d at 620.

Counsel for the Commission point to four possible rationales for the decision at issue: first, that the orders at issue in fact do not constitute compelled wheeling; second, that

---

**16.** S.1725, 74th Cong., 1st Sess., § 213, pp. 105–106, had the following provision:

It shall be the duty of every public utility to furnish energy to, exchange energy with, and transmit energy for any person upon reasonable request therefor . . . .

HR 5423, 74th Cong., 1st Sess., § 213, pp. 104–105, had an identical provision.

the decision is justified because FP&L's policy statement constituted a "practice" and thus was properly required to be filed as part of a tariff under the statute and regulations; third, that the decision is justifiable as a remedy for FP&L's past anticompetitive activity; and fourth, that FP&L is estopped from changing its policy of availability. We discuss each argument in turn.[17]

### A. Do the Commission's Orders Require Involuntary Wheeling?

The Commission reasoned in the decision on review that its order in no way expanded the transmission service obligation which FP&L has voluntarily undertaken. In other words, the Commission stated it had done nothing which requires FP&L to wheel involuntarily since the tariff and policy ordered to be filed had been adopted voluntarily by FP&L. The Commission's counsel glosses this justification by insisting that there has been no compelled wheeling because FP&L has given no indication it desires to change its policy. Commission's counsel at oral argument insisted that the question before this court is not whether the Commission may require transmission service if and when a customer in the future is refused wheeling services or whether the Commission has the authority under § 206(a) to find the tariff unjust and unreasonable or to pass on any proposed change under § 205(d). The Commission's counsel maintains that these are questions for another proceeding if and when the Commission takes the foregoing action. Commission's counsel asserts that all that has been done is to require FP&L to file the tariff and policy as an informational aid both to the Commission and to FP&L's potential customers.

We believe the Commission has failed to perceive the thrust of FP&L's objection. FP&L does not complain that the Commission has at this time issued an order requiring it to provide transmission service to a particular applicant to which it otherwise would not have wheeled. Instead, FP&L objects that the Commission's actions have imposed upon it an obligation to provide transmission service beyond that which it has voluntarily assumed. FP&L objects that in the future it will be required to provide wheeling for any utility requesting tariff service. In effect, FP&L complains that it has now been made a common carrier.

Under common law, a common carrier is one who holds himself out as engaged in the business of providing a particular service to the public. *United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936); *State of Washington ex rel. Stimson Lumber Co. v. Kuykendall*, 275 U.S. 207, 48 S.Ct. 41, 72 L.Ed. 241 (1927). Common carrier status has a quasi-public character, which arises out of the undertaking "to carry for all people indifferently . . . ." *National Association of Regulatory Utility Commissioners v. FCC*, 533 F.2d 601 (D.C.Cir.1976). A carrier will not be a common carrier where its practice is to make individualized decisions in particular cases as to whether and on what terms to serve. *Ibid.; Semon v. Royal Indemnity Co.*, 279 F.2d 737 (5th Cir. 1960). The controlling factor in determining carrier status is the public profession or holding out. *Semon v. Royal Indemnity Co., supra*; 13 Am.Jur.2d, *Carriers*, § 2. The Commission made no findings in this regard, and did not rely upon the common law rationale; accordingly we express no opinion upon the issue of what circumstances might invoke the doctrine of common carrier status established by common law.

Several remarks are appropriate in order to understand whether the Commission's actions amount to compelling involuntary wheeling. First, the parties agree as

---

17. Because some service agreements were unexecuted, the Commission stated that the service provided to those customers is indistinguishable from that available under a tariff. We fail to perceive how the failure to file executed contracts indicates that FP&L was willing to offer wheeling on a tariff basis. Neither the Commission nor its counsel explained how this could occur. We find this statement by the Commission in the orders on review puzzling and unconvincing.

to the effect of filing a tariff together with the policy statement. FP&L would have to abide by the terms of the tariff and policy statement in offering transmission service in the future. So long as the tariff and policy remain on file, they are to be treated as a statute, binding upon FP&L and the purchaser alike. *Northwestern Public Service Co. v. Montana-Dakota Utilities Co.*, 181 F.2d 19 (8th Cir. 1950), *aff'd.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). Because a tariff has been filed, FP&L may not deviate from it in entering interchange transmission service agreements with municipal utilities without filing a change in the tariff. Those utilities requesting wheeling under the terms of the tariff would be entitled to receive transmission service so long as the availability criteria are complied with.[18] In other words, FP&L would be required to serve all qualifying customers until the Commission changes the availability criteria. A customer refused such service could petition the Commission to find that FP&L's practice with respect to its policy of availability is unduly discriminatory under § 206(a) of the FPA.

The parties, however, disagree as to the result of FP&L's having filed 23 individual schedules with postage stamp rates without a tariff filing. The Commission, citing *Town of Norwood v. FERC*, 587 F.2d 1306 (D.C.Cir.1978), maintains that even without a filed tariff and policy statement, a utility which was refused wheeling services in the future by FP&L could petition the Commission under § 206(a) to find such a refusal to be discriminatory. Thus, the Commission reasons that no new restrictions have been placed on FP&L by the filed tariff and policy. In other words the Commission argues, relying upon *Town of Norwood*, that the fact of the 23 individual schedules already places FP&L in the same position as if a tariff had been filed. However, *Town of Norwood* does not so hold. There an

electric utility had entered a wheeling contract with a fixed rate provision, barring any change in the rate. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). The utility was willing to wheel power to a second customer but at higher rates. The second customer petitioned the Commission, claiming undue discrimination. The wheeling utility made no argument that it was free to pick and choose to which customer it would wheel. There was no issue of involuntary wheeling. Instead, the issue was the proper remedy for discrimination in rates when one contract is a fixed rate contract, not subject to change by the Commission except by a § 206(a) proceeding. In this regard, FP&L has not argued that if more than one wheeling agreement is filed, the Commission is precluded from determining that a difference in rates would constitute undue discrimination. FP&L is concerned to preserve its right in the future to refuse wheeling services to applicants. No case is cited, and we have found none, in which a utility which was refused wheeling services brought a petition under § 206(a) for the Commission to find such a refusal discriminatory where no tariff was on file.[19] We have serious doubts that such a petition would be successful in the absence of a tariff. In *FPC v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), the Supreme Court held that the Commission may consider rates over which it does not have jurisdiction in considering whether proposed rates over which it does have jurisdiction are discriminatory. In strong dictum, however, the Supreme Court indicated that the Commission does not have authority to remedy any discriminatory action by requiring a change in rates over which it has no jurisdiction. The Court stated there:

---

18. The form of a tariff as specified in the Commission rules includes conditions of availability. 18 C.F.R. §§ 35.2 and 154.38(b). Thus, by ordering Mr. Bivan's statement of availability policy to be filed, the Commission has incorporated FP&L's policy as the statement of condi-

tions of availability. (See Commission brief of Sept. 9, 1980, p. 14.)

19. Nor have we found cases where applicants which were refused any other service have brought a claim of undue discrimination to the Commission where no tariff was on file.

The prohibition against discriminatory or preferential rates or services imposed by § 205(b) and the Commission's power to set just and reasonable rates under § 206(a) are accordingly limited to sales "subject to the jurisdiction of the Commission," that is, to sales of electric energy at wholesale. The Commission has no power to prescribe the rates for retail sales of power companies. Nor, accordingly, would it have power to remedy an alleged discriminatory or anticompetitive relationship between wholesale and retail rates by ordering the company to increase its retail sales.

426 U.S. at 276–77, 96 S.Ct. at 2003. Any applicant which was refused wheeling services by FP&L would have to overcome this dictum in bringing a § 206(a) petition before the Commission, and also would have to overcome the legislative history and case law indicating that the Commission is without power to compel wheeling.[20]

▆ The parties do not dispute that in the future, if FP&L wishes to alter its policy of availability, it will, if there is a tariff, have to follow the § 205(d) and (e) procedure of filing the proposed change with the Commission. The Commission under this procedure may investigate such a change and reject it as unjust and unreasonable. FP&L, thus, has lost the freedom to alter its policy of availability with respect to wheeling. Moreover, the parties also agree that the Commission under § 206(a) would have the authority to investigate sua sponte FP&L's tariff and policy of availability to determine whether any feature is unjust, unreasonable, unduly discriminatory, or preferential. If such a determination is made, the Commission may adjust the tariff and policy. The Commission in the orders on review clearly indicated that in the future it may require FP&L, either in Docket No. 77–175 or in some other proceeding to amend its tariff if it is found to be unjust or unreasonable. (J.A. p. 2210.) This would include FP&L's policy of availability. Thus, if there is a tariff, the Commission could in the future alter FP&L's policy to one undesired by FP&L's management.

We agree with FP&L that the Commission's order does in effect impose common carrier status upon FP&L. While the tariff is on file, FP&L would be obligated to provide the tariff service to all customers. In a significant sense, its duties and liabilities have changed. Although FP&L had a policy regarding the availability of wheeling, FP&L, nevertheless, negotiated interchange transmission service agreements on an individual basis with each municipal utility when approached. There is no indication in the record that FP&L has voluntarily agreed to become a common carrier. There is no indication that FP&L has voluntarily agreed that any change in the terms of its policy, or any interpretation thereof, should be submitted to the Commission for its approval. The imposition of common carrier status on FP&L, which the orders at issue accomplish, is precisely the authority which the FPA denies the Commission. The legislative history of the FPA makes clear that the Commission lacks the authority to require electric utilities to provide wheeling even on a reasonable request. Accordingly, we conclude that the Commission lacked statutory authority to issue the orders in question.[21]

---

20. The Commission and intervenors complain that FP&L is arguing for license to discriminate in offering wheeling services. Of course, nothing precludes the intervenors from bringing the appropriate antitrust action if FP&L's actions warrant such.

21. The Commission, in rejecting FP&L's argument that *Otter Tail* had interpreted the FPA to prohibit compelled wheeling, stated that *Otter Tail* had noted that terms and conditions governing transmission services are subject to Commission oversight, citing to 410 U.S. at

376-77, 93 S.Ct. at 1028–1030. The Commission misconstrues *Otter Tail*. In *Otter Tail* the Supreme Court was concerned in part with the question of whether the antitrust remedy ordered by the district court conflicted with Commission jurisdiction insofar as the district court had ordered both wheeling and interconnections. The Supreme Court held there was no conflict with respect to wheeling since the Commission had no authority to compel wheeling. 410 U.S. at 375–76, 93 S.Ct. at 1028–1029. The part of the decision cited by the Commission dealt with the Supreme Court's discussion

B. Is the availability policy a "practice" within the meaning of § 205(c)?

■ A second ground for the Commission's decision was its conclusion that FP&L's availability policy constituted a "practice" within the meaning of § 205(c) of the FPA and § 35.1 of its Regulations. 18 C.F.R. § 35.1(a) (1980).[22] A policy of availability has been held to be a "practice," subject to the filing requirements, with respect to a pipeline tariff. See *Michigan-Wisconsin Pipeline Company*, 34 FPC 621, 626 (1965).[23] As explained above, a practice made a part of a filed tariff, is subject to the Commission's right to review such practice and to pass on changes within it.[24] A reviewing court normally should adhere to the construction of a statute by an agency charged with its execution unless there are compelling reasons that such construction is wrong. *ECEE v. FERC*, 611 F.2d 554, 563 (5th Cir. 1980). In the context of wheeling, the FPA's legislative history is a compelling reason why we may not defer to the Commission's interpretation. Having held that the FPA prevents the imposition of common carrier status on utilities for wheeling services, it would make no sense to permit the imposition of this status by the device

of requiring a utility to file any policy of availability as a practice. It is reasonable to assume that any well-managed utility will have a policy governing the availability of wheeling services and will act on this policy. Giving the Commission the authority to order a policy of availability to be filed as a "practice" could vitiate Congress' desire to leave utilities free to make wheeling decisions.

C. Anticompetitive Remedy.

■ The Commission's counsel and intervenors argue that the Commission justified, in part, its requirement that FP&L's sworn policy be included in the tariff as a remedy for FP&L's history of anticompetitive conduct and as part of the Commission's duty to implement this nation's antitrust laws. (See Commission's brief, p. 25).

We note that the Supreme Court in *Otter Tail* clearly held that a district court in an antitrust suit has the authority to require wheeling as a remedy. The authority of the Commission to order wheeling as an antitrust remedy, though, is more questionable.[25] The District of Columbia Circuit has

---

of possible conflict with the Commission's authority to order interconnections. The Supreme Court noted that "future disputes over interconnections and the terms and conditions governing those interconnections will be subject to Federal Power Commission perusal." 410 U.S. at 376–77, 93 S.Ct. at 1029. The Commission has the authority under § 202(b) of the FPA to order physical connection of transmission facilities. Thus, the citation relied upon by the Commission ·referred to its authority over interconnections, for which there is a statutory basis, and does not support its actions with respect to wheeling.

**22.** Section 205(c) of the FPA, 16 U.S.C.A. § 824d(c) (West 1974), reads in full:

(c) Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or re-

late to such rates, charges, classifications, and services.

18 C.F.R. § 35.1(a) (1980) reads in pertinent part:

Every public utility shall file with the Commission and post, in conformity with the requirements of this Part, full and complete rate schedules, as defined in § 35.2(b), clearly and specifically setting forth all rates and charges for any transmission or sale of electric energy subject to the jurisdiction of this Commission, `the classifications, practices,· rules and regulations affecting such rates and charges and all contracts which in any manner affect or relate to such rates, charges, classifications, services, rules, regulations or practices, as required by section 205(c) of the Federal Power Act (49 Stat. 851; 16 U.S.C. § 824d(c)).

**23.** Provisions of the Natural Gas Act are to be read *in pari materia* with analogous provisions of the FPA. *FPC v. Sierra Pacific Co., supra.*

**24.** See discussion in Part II.A. of this opinion.

**25.** In noting that the Commission's authority to order wheeling as a remedy for alleged anticompetitive activity is open to some doubt, we

suggested in dictum that the Commission may order wheeling based on specific showings of discrimination or anticompetitive activities by a utility. *Richmond Power & Light of Richmond, Indiana v. FERC*, 574 F.2d at 623. On the other hand, the Supreme Court in dictum has indicated that the Commission may not take action to remedy anticompetitive conduct when it lacks authority to take such action. In *FPC v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), the Court stated:

> The Commission has no power to prescribe the rates for retail sales of power companies. Nor, accordingly, would it have power to remedy an alleged discriminatory or anticompetitive relationship between wholesale and retail rates by ordering the company to increase its retail rates.

426 U.S. at 276–77, 96 S.Ct. at 2003. Moreover, the Second Circuit in *New York Electric & Gas Corp.* suggested that the Commission may not order wheeling, in the absence of compliance with §§ 211 and 212, even upon a finding that a utility has engaged in anticompetitive activities in violation of antitrust policy.

In the instant case, however, we need not resolve the question as to what power the Commission may have to remedy antitrust violations, since we conclude that the Commission did not rely on this rationale. There can be little doubt that FP&L's business conduct in the past has not been exemplary in that it has been found to have engaged in a conspiracy with Florida Power Corporation to divide the wholesale power market in Florida. *Gainesville Utilities Department v. Florida Power & Light Co.*, 573 F.2d 292 (5th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). But the Commission neither relied upon the anticompetitive findings in *Gainesville*, nor did it make any findings of anticompetitive activities or violations in the orders on review. Instead, it relied upon the fact that FP&L possessed monopoly power over

wholesale and retail markets in Florida, and that filing the tariff would have "procompetitive effects."

The Commission in the instant orders did refer to *Florida Power & Light Co.*, Opinion No. 57, 32 Pub.U.Rep. 4th [P.U.R.] 313 (Aug. 3, 1979), *appeal dismissed sub nom. Florida Power & Light Co. v. FERC*, No. 79–2414 (D.C.Cir. April 25, 1980), an opinion issued with respect to Phase I of Docket No. ER78–19, *et al.*[26] The Commission noted that in Opinion No. 57, it had found certain proposed availability restrictions in FP&L's wholesale power tariff to have serious anticompetitive effects. It further noted that in Opinion No. 57, it had found FP&L to have monopoly power over wholesale and retail sales and that the availability of interchange transmission service had a bearing on competitive relationships within the relevant markets. The Commission then reasoned in the orders on review that the presence of the policy statement in the tariff would have a definite procompetitive effect. While the reference to Opinion No. 57 indicates a concern over FP&L's dominance in the Florida markets, the Commission did not make any finding in the order on review that any specific anticompetitive activities or antitrust violations had occurred. Nor did the Commission find any antitrust violation in Opinion No. 57. Indeed, Opinion No. 57 was prefaced with this warning:

> The Commission acknowledges that it is not specifically responsible for enforcing the Sherman Act or any other of this nation's antitrust laws. *And we wish to emphasize that in evaluating the anticompetitive effects of a proposed rate change and in making findings with respect thereto, we do not make findings that violations of the antitrust laws have occurred.* Instead, it is our *obligation* to evaluate the public policies expressed in Federal antitrust laws and to reflect those policies in the conduct of our responsibilities under the Federal Power

are aware that the Commission has a duty to consider anticompetitive effects of activities requiring Commission approval.

**26.** *See* footnote 3, *supra.*

Act. This we have endeavored to do in the instant case.

(J.A., p. 2123, 32 P.U.R. 4 at 315, only first emphasis supplied, footnote omitted). The fact that Opinion No. 57 concluded that FP&L had monopoly power and that the proposals there under review would have anticompetitive effects does not amount to a finding of any specific anticompetitive activity or of any antitrust violation.[27]

A close reading of the orders on review as well as Opinion No. 57 convinces us that the Commission did not issue the orders in question as a remedy.[28] Instead, as we read the orders, the Commission was attempting to foster competition in the Florida area. While we deem this a laudable goal, we conclude that, in the absence of findings of specific anticompetitive activities or antitrust violations, the Commission is without authority under the FPA to compel wheeling. We pretermit decision on whether the Commission has authority to compel wheeling as a remedy for specific findings of anticompetitive activities or antitrust violations.

### D. Is FP&L Estopped from Changing Policy?

▋ The Commission further reasoned that the policy statement by Mr. Bivans was given to rebut antitrust allegations made by the staff in Docket No. ER77–175

and that it was undoubtedly intended that the Commission would rely upon that statement in reaching a decision in that docket. The Commission concluded that FP&L could have anticipated nothing other than that the availability criteria would be given publication and effect.

Insofar as the Commission was relying upon a form of equitable estoppel, there is nothing in this record indicating that the Commission has relied upon FP&L's testimony. Among the many forms of equitable estoppel is the principle which imposes an obligation on a person to live up to his representations where inequitable consequences would result to persons having the right to rely, and who in good faith did rely, on the representation. *See Mitchell v. Aetna Casualty & Surety Co.*, 579 F.2d 342, 348 (5th Cir. 1978). The Commission has not rendered its final decision in Docket No. ER77–175. We do not even know whether the Commission has given credence to Mr. Bivans' testimony.

Nor do we understand the Commission's conclusion that FP&L could have anticipated nothing other than that the policy would be published and given effect. Under the FPA, FP&L could reasonably have anticipated that it could choose, absent any violation of the antitrust laws or § 205(b), to whom it would wheel power. Accordingly, when it gave its testimony, it could

---

**27.** Mere possession of market power without more such as an attempt to restrain trade or to monopolize, is not unlawful. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Byars v. Bluff City News Co.*, 609 F.2d 843, 853 (6th Cir. 1979). The additional element may be an attempt to restrain trade or an attempt to monopolize, *ibid.*, findings not made by the Commission in the orders on review or in Opinion No. 57. Nor can an antitrust violation be found on the basis of a finding that a proposed wholesale tariff would have an anticompetitive effect without a finding of anticompetitive intent or purpose. In a § 2 Sherman Act action for monopolizing, it is necessary to show that monopoly power has been coupled with a purpose or intent to exercise that power. *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

**28.** Insofar as the Commission believed these orders would be appropriate remedies for anticompetitive activities or antitrust violations, it failed to make appropriate findings of such activities or violations. Nor did it provide any explanation as to how ordering this tariff filed, with its policy statement, would provide a remedy in order for us to ascertain the reasonableness of its action. In the orders on review, the Commission stated, "We also found [in Opinion No. 57] that the availability of interchange transmission services, at issue here, did not significantly diminish [FPL's monopoly] power; however, these services do have a bearing on competitive relationships within the relevant markets." (J.A., p. 2209.) If availability of interchange transmission does not significantly diminish FPL's monopoly power, this court is left with some question as to whether wheeling would be an appropriate antitrust remedy.

assume that it could interpret, and even alter, its policy of availability without prior approval from the Commission. Such an assumption does not indicate untruthfulness on the part of Mr. Bivans or any bad faith by FP&L. There is nothing in the record to indicate that FP&L was being anything other than completely truthful in its testimony.[29]

For the foregoing reasons, we RE-VERSE.

---

**29.** Commission's counsel cites several cases for the proposition that regulatory agencies may bind parties to representations made in support of requests for relief. We find all these cases distinguishable. In *United States v. Chesapeake & Ohio Railway Co.*, 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976), railroads justified requests for tariff increases on the ground that certain capital and maintenance expenses were needed. The Supreme Court held that the Interstate Commerce Commission ("ICC"), as an adjunct to its power to suspend and investigate rate increases, could condition the immediate implementation of the rate increase without investigation on the railroads devoting the increase to the specified capital and maintenance expenses. While the Court gave as one reason for its decision the representation by the railroads, the decision was grounded on the ICC's powers under its authority to suspend and investigate increases. In the three other cases cited, the representations were made as specific inducements to obtain agency relief. In *FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583 (1955), a company proposing a merger voluntarily proposed as a condition for approval of the merger a specified allocation of costs. The FPC included this condition in its certificate of public convenience and necessity approving the merger. In *Admiral-Merchants Motor Freight, Inc. v. United States*, 321 F.Supp. 353 (D.Col.) (three judge panel), *aff'd per curiam*, 404 U.S. 802, 92 S.Ct. 51, 30 L.Ed.2d 37 (1971), the ICC granted the parties an extension of time on a hearing with respect to rates on condition that if the rates were found unjust and unreasonable, a refund would be made for the extended period. The carriers first objected to this condition, but then acceded to it in order to obtain the extension in time. In *Amoskeag Co. v. ICC*, 590 F.2d 388 (1st Cir. 1979), a company began acquiring stock in a railroad. When objections were made concerning the acquisition of the stock, the company made an express oral and written commitment to the ICC to refrain from purchasing stock in exchange for which the company obtained the names of stockholders of the railroad.