775 F.2d 366
 249 U.S.App.D.C. 316, 54 USLW 2239,
69 P.U.R.4th 543
 CLARK-COWLITZ JOINT OPERATING AGENCY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
People of the State of California, et al., Pacific Power &
Light Company, Edison Electric Institute, Sacramento
Municipal Utility District, et al., Pacific Gas & Electric
Company, Public Utility Commissioner of the State of Oregon,
Washington State Department of Fisheries, et al., American
Paper Institute, Inc., City of Santa Clara, California, et
al., American Public Power Association, Intervenors.
 No. 83-2231.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 18, 1984.
Decided Oct. 22, 1985.
As Amended Oct. 24 and 28, 1985.
Rehearing En Banc Granted, Judgment and Opinion Vacated Jan. 16, 1986.
 
 J. Skelly Wright, Circuit Judge, concurred in part and filed opinion.
 Petition for Review of an Order of the Federal Energy Regulatory commission.
 Christopher D. Williams, Washington, D.C., with whom Robert L. McCarty, Washington, D.C., was on brief, for petitioner.
 Jerome M. Feit, Sol., Federal Energy Regulatory Commission, Washington, D.C., with whom Arlene P. Groner, Atty., Federal Energy Regulatory Commission, Washington, D.C., was on brief, for respondent.
 
 
 1
 Hugh Smith, Portland, Or., with whom Thomas H. Nelson, Portland, Or., was on brief, for intervenor Pacific Power & Light Company.
 
 
 2
 James M. Johnson, Olympia, Wash., for intervenors Washington State Department of Fisheries, et al.
 
 
 3
 Robert C. McDiarmid, Daniel I. Davidson, Frances E. Francis, Marc R. Poirier, G. Philip Nowak and Charles H. Cochran, Washington, D.C., for intervenors Sacramento Municipal Utility District, et al.
 
 
 4
 James B. Liberman, Washington, D.C., Ira H. Jolles, New York City, and Peter B. Kelsey, Washington, D.C., were on the brief, for intervenors Edison Electric Institute.
 
 
 5
 Rigdon H. Boykin, New York City, was on brief for intervenor American Paper Institute, Inc.
 
 
 6
 W. Benny Won, Salem, Or., was on brief for intervenor Public Utility Commissioner of the State of Oregon.
 
 
 7
 Frederick H. Ritts and Mark D. Nozette, Washington, D.C., were on brief for intervenor American Public Power Association.
 
 
 8
 J. Calvin Simpson, San Francisco, Cal., entered an appearance for intervenor People of the State of California, et al.
 
 
 9
 Robert C. McDiarmid and Frances E. Francis, Washington, D.C., entered an appearance for intervenor City of Santa Clara, California, et al.
 
 
 10
 Malcolm H. Furbush, San Francisco, Cal., entered an appearance for intervenor Pacific Gas & Electric Co.
 
 
 11
 Before ROBINSON, Chief Judge, and WRIGHT and MIKVA, Circuit Judges.
 
 MIKVA, Circuit Judge:
 
 12
 This case involves a contest over a license to run a major hydroelectric power project in the state of Washington. Its significance, however, extends substantially beyond the instant dispute and raises important questions about the meaning of Sec. 7(a) of the Federal Power Act, 16 U.S.C. Sec. 800(a) (1982), the significance of the definitive precedent interpreting it, and the binding effect of a decision rendered by one of our sister circuits. The resolution of these questions is of considerable importance to the future of hydroelectric power and the nation's utility industry.
 
 
 13
 Clark-Cowlitz Joint Operating Agency ("Clark-Cowlitz") petitions for review of two Federal Energy Regulatory Commission ("FERC" or "Commission") orders which overturned an Administrative Law Judge's ("ALJ") decision awarding Clark-Cowlitz the license to operate the Merwin Hydroelectric Power Project. After a hearing, the ALJ had determined that the two applicants were "equally well-adapted" to operate the project. Then, relying upon a major FERC decision, City of Bountiful, Utah, 11 F.E.R.C. (CCH) p 61,337 (June 27, 1980), reh'g denied, 12 F.E.R.C. (CCH) p 61,179 (Aug. 21, 1980), aff'd sub nom. Alabama Power Co. v. FERC, 685 F.2d 1311 (11th Cir.1982), cert. denied, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983) (Bountiful ), which declared the "municipal preference" applicable to relicensings, the ALJ had awarded the new license to the public applicant, Clark-Cowlitz, rather than its rival, the incumbent private applicant Pacific Power & Light Company ("Pacific Power").
 
 
 14
 On review, the Commission abruptly announced that Bountiful was wrong and that the Commission was not bound to follow it. The Commission asserted that Bountiful's affirmance by the United States Court of Appeals for the Eleventh Circuit was irrelevant. Equally irrelevant, it claimed, was the fact that the Supreme Court had denied certiorari despite a specific request from the Solicitor General detailing FERC's change of position. Also allegedly irrelevant was the fact that both Merwin applicants had intervened in the Bountiful proceeding. The Commission also asserted that, in any event, because of "broad economic considerations," the two applicants were not equal. Clark-Cowlitz argues that (1) the Commission was bound by res judicata or collateral estoppel and could not overrule Bountiful with respect to the parties, (2) the Bountiful interpretation of the statute is, in fact, the correct one, and (3) that FERC's 'economic impacts' analysis is unreasonable on its face and arbitrary as applied. We find Clark-Cowlitz's contentions substantially correct. Accordingly, we reverse and remand to the Commission for proceedings consistent with this opinion.
 
 FACTS
 
 15
 This case derives from a dispute as to which of two entities is entitled to the license to operate the Merwin Hydroelectric Power Project. Merwin is a dam situated on the Lewis River between Clark County and Cowlitz County, Washington. Merwin creates a reservoir covering about 4,000 acres and containing more than 400,000 acre feet of water and has a capacity of approximately 136 million watts.
 
 
 16
 Petitioner Clark-Cowlitz is a municipal corporation created for the purpose of seeking the license in question here. It represents a joint effort of the public utilities districts of Clark County and Cowlitz County. Clark-Cowlitz's constituent entities are in charge of electrical distribution in their respective counties and currently receive the bulk of their electricity from the Bonneville Power Administration ("BPA"). If Clark-Cowlitz were to secure the Merwin license, Merwin would supply all its electrical needs and it would no longer need to buy power from BPA. Clark-Cowlitz is a "municipality" within the meaning of the Federal Power Act.
 
 
 17
 Intervenor Pacific Power is a private corporation and the project's incumbent licensee. It took over the original 50-year license from another private corporation, Inland Power and Light Company ("Inland"). As licensee, Pacific Power has transmitted energy from the project to six states but has not served the communities in the vicinity of the dam. Were Pacific Power to fail in its efforts to have its license renewed, it would be forced to seek alternative sources of supply. Pacific Power does not meet the Federal Power Act's definition of a "municipality."
 
 
 18
 Like numerous other hydropower projects across the nation, Merwin was originally licensed in the 1920's (specifically 1929) for a 50-year period. Also like other projects, as a result of the absence of a public entity willing and able to undertake the project, Merwin was licensed to a private corporation, Inland. In 1941, the license was transferred--with Commission approval--to Pacific Power. The license was scheduled to expire in 1979. Consequently, in 1976, Pacific Power filed an application for renewal. Shortly thereafter, Public Utility District No. 1 of Clark County and Public Utility District No. 1 of Cowlitz County formed Clark-Cowlitz and filed a competing application.
 
 
 19
 Numerous other licenses were scheduled to expire at or about the same time as Merwin. Although in many cases the incumbent's application for relicensing was unopposed, in a substantial number, as here, public entities expressed interest in competing. These public entities noted and invoked the statute's "municipal preference" provisions. Section 7(a) of the Federal Power Act, 16 U.S.C. Sec. 800(a) (1982). It immediately became apparent that the preference provisions would be the decisive issue in those cases. One public entity, the City of Bountiful, Utah, recognized that the viability of its application for a project would turn on the municipal preference issue and that an adverse ruling on that issue would render litigation of other issues virtually superfluous. Accordingly, Bountiful moved for a declaratory determination that the municipal preference applied in relicensings. Other parties who were facing relicensing proceedings in which municipal preference would be determinative moved to intervene in that proceeding. All the applications for intervention were granted. In effect, Bountiful and the intervenors sought separate trials; a first trial in which the issue of law common to all the proceedings would be definitively resolved; and then individual trials in each case to resolve the largely factual questions which would determine whether the applicants were in fact equally well adapted. The Commission agreed that the proposed format was both appropriate from a legal point of view and desirable from the standpoint of consistency and efficiency. The municipal preference issue was exhaustively briefed and the Commission conducted an unprecedented full day of oral argument. The Commission then ruled unanimously that the municipal preference did apply in all relicensings, including those involving incumbent licensees. The private entities petitioned for rehearing but their request was unanimously denied. The private entities then petitioned for review in the United States Court of Appeals for the Eleventh Circuit.
 
 
 20
 As soon as the Commission rendered its unanimous decision in Bountiful, Clark-Cowlitz began pressing FERC to schedule its Merwin application for a hearing as soon as possible. Three days before the proceedings were to begin, the United States Court of Appeals for the Eleventh Circuit handed down its decision affirming Bountiful. The Eleventh Circuit found FERC's conclusion (that the statutory municipal preference applied to all relicensing as well as to original licensing) correct. The court went a step further and noted that the alternative interpretation urged by the private utilities would lead to "absurd" results. Alabama Power Co. v. FERC, 685 F.2d 1311, 1318 (11th Cir.1982).
 
 
 21
 The applicability of the municipal preference was therefore regarded by both parties as established, and the issue was not litigated in the Merwin proceeding. Neither Clark-Cowlitz nor Pacific Power contested the applicability of Bountiful. Neither requested that the Commission overrule it. In fact, Pacific Power explicitly conceded that Bountiful was binding on the Merwin proceeding. The sole dispute, then, was whether the parties were "equally well adapted to conserve and utilize the water resources of the region." Joint Statement of Major Contested Issues, reprinted in J.A. at 298-300. The issues in the case, according to the parties' statement, included a comparison of the competing applicants as to power generation, electric and hydraulic coordination, flood control, fishery and wildlife protection and recreation. Additionally, the ALJ was asked to consider "the scope of the Commission's public interest review" and "whether the Commission should take into account the economic effects of issuing the license." At the conclusion of the hearing, the ALJ determined that the two applicants were equally well adapted. He then applied the municipal preference and concluded that the license must go to Clark-Cowlitz rather than the incumbent.
 
 
 22
 Following the ALJ's decision, Pacific Power appealed immediately to the Commission contending that it was superior, not equal, to Clark-Cowlitz and that consequently the municipal preference should not have been applied.
 
 
 23
 In the meantime, the private utilities in Bountiful had petitioned for certiorari and, following the 1980 election, the Commission had undergone a substantial change in personnel. The new Commission members met in secret session (see Clark-Cowlitz Joint Operating Agency v. FERC, 775 F.2d 359 (D.C.Cir.1985)) to consider their litigation strategy with respect to the petition for certiorari in the Bountiful case. At the closed meeting, the Commission made a policy decision to shift its support on the Bountiful question to the private utilities, to oppose the agency's own prior decision, and to ask that the Solicitor General inform the Supreme Court of the agency's changed viewpoint and request that the petitions for certiorari be granted and the matter be remanded to the Commission. The Solicitor General declined to comply precisely with the Commission's request. Instead, his brief stated:
 
 
 24
 We are informed that at this [litigation strategy] meeting, a majority of the Commissioners, four of whom were appointed after the issuance of Opinion Nos. 88 and 88A [Bountiful ], expressed their disagreement with the Commission's earlier position in those orders. At the conclusion of the meeting, the Commission voted to request the Solicitor General to recommend to this Court that the Court grant the petitions for certiorari, vacate the judgment of the court of appeals, and remand the case to that court with instructions to remand to the Commission for further consideration.
 
 
 25
 * * *
 
 
 26
 The Solicitor General believes that, given the importance of the question, [and] the apparent changes in the views of the Commission ... the court of appeals should itself be given an opportunity to reconsider the case....
 
 
 27
 Brief for the Federal Energy Regulatory Commission on Petitions for a Writ of Certiorari at 8-9, Utah Power & Light Co. v. FERC, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983), reprinted in J.A. at 106-07. Accordingly the Solicitor General requested that the petition be granted but that the matter be remanded to the Eleventh Circuit, rather than the Commission. Despite this request, the Supreme Court denied certiorari. Utah Power & Light Co. v. FERC, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983).
 
 
 28
 After the Supreme Court denied certiorari, the Commission ruled on Pacific Power's appeal in the Merwin matter. The Commission not only agreed with Pacific Power but went a step further and expressly overruled Bountiful. The Commission placed its discussion of Bountiful and the municipal preference at the very beginning of its opinion. The Commission noted that it "could be argued that this part of the decision ... is gratuitous and obiter dictum ... [but] we could not agree with such an argument." Rather, the Commission insisted that "[o]ur position is that Bountiful is wrong" and "our decision to overrule [it] is neither gratuitous nor obiter dictum." 25 F.E.R.C. (CCH) p 61,052 at 61,177 (Oct. 7, 1983).
 
 
 29
 The Commission announced that states and municipalities do not have a preference in any relicensing case involving the "original licensee."
 
 The Commission asserted:
 
 30
 Today ... we have come to the conclusion that Bountiful was wrong and should be overruled. We believe Bountiful's conclusion was legally erroneous and that states and municipalities have a relicensing preference against all adversary non-preference applicants other than "original licensees" in possession....
 
 
 31
 25 F.E.R.C. at 61,176 (emphasis added).
 
 
 32
 The Commission averred that in spite of the parties' participation in the Bountiful litigation, the Eleventh Circuit's decision, and the Supreme Court's denial of certiorari, there was "no legal impediment" to overruling Bountiful. Id. Addressing itself to the merits, the Commission dismissed the legislative determination that "a permitting and licensing preference for States and municipalities was in the public interest" as "a conception of that era." Id. at 61,192. Accordingly, the Commission reversed the ALJ's award and gave the license to Pacific Power.
 
 
 33
 The Commission acknowledged that there were no significant differences between Pacific Power and Clark-Cowlitz's plans and that there was "no reason to question" Clark-Cowlitz's ability to finance the acquisition of the Merwin development or finance Merwin's continued operation and maintenance. It asserted, however, that broad "economic considerations" are within its scope of review in assessing the "public interest." These factors, it claimed, weighed in favor of allowing "the segments of the public" served by Pacific Power to retain the benefits of Merwin power. Therefore, even if Bountiful were not wrong, the Commission reasoned, the ALJ's award would have to be revoked because the two applicants were not equal. The Commission did not address the ALJ's conclusion that there would be a "wash" of costs and benefits to all consumers in the region.
 
 
 34
 The Commission further found that the portion of Sec. 7(a) providing that
 
 
 35
 the Commission shall give preference to applications ... by states and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission, be made equally well adapted....
 
 
 36
 does not require any sort of post-hearing opportunity to cure deficiencies. Two Commissioners dissented from the portion of the opinion reversing Bountiful.
 
 
 37
 Clark-Cowlitz immediately sought a rehearing. As a result of FERC's abrupt decision to overrule Bountiful, numerous representatives of the power industry--both public and private--intervened. The public power organizations sided with Clark-Cowlitz and requested rehearing. The private power companies aligned themselves with the Commission's new position. The Commission denied rehearing in a two-page boilerplate order. This appeal ensued.
 
 
 38
 This court has jurisdiction under Sec. 313(b) of the Federal Power Act, 16 U.S.C. Sec. 8251(b) (1982). The American Public Power Association, and a number of cities and public utility authorities, including the City of Bountiful itself, have intervened in support of Clark-Cowlitz. The Pacific Power & Light Company has intervened in support of FERC's new decision in its favor. Pacific Power is joined by several entities representing private utilities' interests, by an organization of paper manufacturers, and by the public utility authorities of Oregon and California. The Washington Departments of Fisheries and Game intervened for the limited purpose of addressing issues related to wildlife conservation.
 
 DISCUSSION
 I. Res Judicata/Collateral Estoppel
 
 39
 Initially, the controversy over the Commission's reversal of its own policy, after that policy had been upheld by a federal court of appeals and the Supreme Court had declined to review it, presents this court with a substantial question in the area of preclusion. Clark-Cowlitz claims that the Commission's abrupt about-face on the municipal preference issue constitutes an attempt to relitigate a decided question, in stark violation of the closely-related principles of res judicata and collateral estoppel. Clark-Cowlitz never specifies which of the two doctrines it considers violated, but refers instead in each instance to both. The other parties seem to share the petitioner's uncertainty. Confusion as to whether the problem involved is one of res judicata (claim preclusion) or collateral estoppel (issue preclusion) is the understandable result of the unusual circumstances of this case and the ambiguities in the doctrines themselves.
 
 
 40
 The gist of petitioner's argument is that the legal question of whether the municipal preference applies to relicensing proceedings in which the original licensee is a party was exhaustively litigated and definitively resolved in Bountiful. Indeed, Clark-Cowlitz contends, the resolution of the meaning of the municipal preference was the sole purpose of the Bountiful proceeding. To permit relitigation of that issue now would be to render Bountiful a nullity and to imply that the Eleventh Circuit's opinion had been advisory and, hence, unconstitutional.
 
 
 41
 The Commission's rebuttal is not very persuasive. Its argument boils down to an assertion that application of preclusion here would "freeze the development" of the law and an admonition that the doctrine should not be applied "rigidly" and "woodenly." The Commission's ally, Intervenor Public Utility Commissioner of Oregon, is bolder: he declares outright--in underscored letters--that "the Eleventh Circuit's decision affirming the Commission's Opinion 88 [Bountiful] was an unconstitutional advisory opinion issued in the absence of any actual controversy. The decision therefore had no legal effect." Brief of Intervenor Public Utility Commissioner of Oregon at 7 (emphasis in the original).
 
 
 42
 We reject the harsh allegations of unconstitutional conduct by the Eleventh Circuit. Wholly apart from the dubious propriety of a sister circuit construing a decision in such a fashion, and the Commission's implying misconduct by the Eleventh Circuit for upholding the Commission's decision, the facts do not bear out the charge. There was a definite case and a very lively controversy at the time the Eleventh Circuit acted on the Bountiful matter. The issue was handled as a declaratory matter because all parties recognized the issue as one which would arise in essentially identical form in several pending and a large number of impending cases. The City of Bountiful and others recognized that the viability of their hydropower applications turned upon the applicability of municipal preference. All agreed that in the interests of clarity, consistency, judicial economy, efficiency and the avoidance of needless expense, the question should be separated and resolved in one consolidated proceeding rather than separately litigated in each and every one of the cases in which it was certain to arise. The sole and entire purpose of the Bountiful proceeding was to resolve the municipal preference issue. The Commission, Clark-Cowlitz and Pacific Power, as well as numerous other intervenors, took part in the Bountiful proceeding and litigated energetically. After extensive briefing and a full day of oral argument, the Commission ruled unanimously that the municipal preference unambiguously applied to all relicensings, including those involving incumbent licensees. The private utilities immediately petitioned for review.
 
 
 43
 When presented with the case, the Eleventh Circuit recognized that the declaratory format raised a threshold question of case or controversy. See Alabama Power, 685 F.2d at 1314. Although all parties to the appeal urged the Eleventh Circuit to reach the merits, id., the court recognized its obligation to explore the threshold jurisdictional question and refrain from acting if such action would violate Article III. Only after consideration and discussion did the court conclude that the dispute did present an actual case or controversy. Id. at 1315.
 
 
 44
 The court noted that the judiciary is "reluctant to apply declaratory judgments to administrative determinations 'unless these arise in the context of a controversy "ripe" for judicial resolution.' " Id. (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). After devoting several paragraphs to discussing the pertinent Supreme Court precedents, the court found that the issue presented was "purely legal," and that "the challenged agency action [would] have a direct and immediate impact on the petitioners, the states, and all potential applicants, as well as the workload of the Commission." Id. It further found that "the resolution of this issue now will foster effective enforcement and administration by the agency." Id. The Eleventh Circuit thus concluded that it had jurisdiction.
 
 
 45
 On the merits, the court found the Commission's interpretation reasonable; however, it did not uphold the Commission's interpretation because it was one reasonable interpretation among many. Rather, the court applied a much stricter standard of review to the agency decision and held that the other interpretation being urged was clearly wrong. The court stated categorically that the interpretation suggested by private power interests "changes the statute's entire preference structure," and would make the statutes application "confusing and sporadic." Id. at 1316. The court concluded that the proffered interpretation would effectively render the preference a nullity because the public sector would then be preferred only when a project was so unsuccessful that the incumbent had no desire to renew. Id. "Thus," the court continued, "states and municipalities realistically would have no preference at all because a preference to a losing project is worthless." Id. The private utilities requested rehearing en banc. The request was unanimously denied.
 
 
 46
 Thus, the Eleventh Circuit squarely addressed and squarely rejected the argument currently being made by the Commission. More important, as detailed in some length above, the Supreme Court was informed of the Commission's changed stance and of the Solicitor General's opinion that "under traditional res judicata principles, if this Court denies certiorari ..., [the parties] may be bound by the Commission's order in any future relicensing proceeding," and responded by denying certiorari.
 
 
 47
 It was in the aftermath of the Eleventh Circuit's ruling that the ALJ held a hearing on the competing applications to operate Merwin and, applying the Bountiful precedent, concluded that the license should go to Clark-Cowlitz. Having failed to secure the Supreme Court's cooperation in its dramatic policy reversal, the Commission apparently decided to pursue another tack--one already hinted at in the transcript of FERC's closed meeting--a backdoor reversal in Merwin.
 
 
 48
 Thus, without formal notice to the affected parties, and without any briefing or argument, summary reversal of Bountiful was announced by the Commission as one of its reasons for reversing the ALJ's determination. Despite the substantial resources and energy invested by all parties in pursuing the Bountiful litigation, the Commission claims that it was in no way bound by the result of that litigation and could reverse the case and reject the statutory interpretation it embodied at will. Clark-Cowlitz contends rightly that at least as to the parties that actually participated in the Bountiful decision relitigation is barred.
 
 
 49
 Res judicata and its fraternal twin collateral estoppel are venerable common law doctrines. They have been the subject of numerous cases and much commentary. There is a consensus that both doctrines are "firmly fixed in the firmament of federal jurisprudence." See Faucett Associates, Inc. v. AT & T, 744 F.2d 118, 125 (D.C.Cir.1984), and cases cited therein. There is also consensus that they advance the same interests: protection of litigants from the vexation and expense of repetitious litigation, protection of the courts from the burden of unnecessary litigation, promotion of respect for the judicial process and confidence in the conclusiveness of judicial decision-making, avoidance of disconcertingly inconsistent results, and securing the peace and repose of society. See, e.g., United States v. Mendoza, 464 U.S. 154, 157-59, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984); Allen v. McCurry, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); Faucett, at 124; Otherson v. Department of Justice, 711 F.2d 267, 271, 273 (D.C.Cir.1983); Segal v. AT & T, 606 F.2d 842, 846 (9th Cir.1979). "The principle is simply that later courts should honor the first actual decision of a matter that has been actually litigated." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure Sec. 4416 at 136 (1981).
 
 
 50
 At the practical level of definition and application, however, agreement stops and confusion sets in. A survey of relevant informed opinion reveals little agreement as to how the doctrines should be defined, how they differ from each other, or how the two may be reliably differentiated in any but the most commonplace situations.
 
 
 51
 Res judicata is sometimes used as a generic term encompassing the whole field of preclusion with collateral estoppel a mere subset, see, e.g., 4 K. Davis, Administrative Law Treatise Secs. 21:1-21:9 (2d ed. 1983), sometimes to mean a more narrow, specific type of preclusion, and sometimes to refer to both, see, e.g., Allen v. McCurry, 449 U.S. at 94 n. 5, 101 S.Ct. at 415 n. 5 (with the narrower meaning distinguished as pure res judicata); Kaspar Wire Works, Inc. v. Leco Engineering and Machine, Inc., 575 F.2d 530, 534-40 (5th Cir.1978).
 
 
 52
 Under res judicata, the Supreme Court has said, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. at 94, 101 S.Ct. at 414. Under collateral estoppel, by contrast, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Id. (emphasis added). Res judicata, it is commonly said, prevents a party "from relitigating the same cause of action against the parties to a prior decision." Mendoza, 464 U.S. at 163, 104 S.Ct. at 574.
 
 
 53
 Collateral estoppel is typically said to "foreclose[ ] litigation only of those issues of fact or law that were actually litigated and necessarily decided by a valid and final judgment between the parties, whether on the same or a different claim." Segal v. AT & T at 845 (emphasis added, citations omitted).
 
 
 54
 In an effort to organize and simplify this body of law, the Restatement (Second) of Judgments introduced and urged the adoption of the terms "claim preclusion" and "issue preclusion." Unfortunately this did little to dispel the confusion because the two new terms are invariably defined in terms of the old. See, e.g., Otherson, 711 F.2d at 273. All the old problems are thus incorporated by reference into the new terms. Further "[t]he distinction between an issue and a claim is often one of degree and emphasis in applying a deeper principle that an original misadventure cannot be retrieved for a second chance." 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4402 at 10. The problem was never really one of difficult terminology but rather one of inadequately delineated concepts. What generally travels under the name of res judicata is a preclusion problem where the alignment of parties, facts, and allegations is exceedingly close; collateral estoppel is generally applied when the alignment is less tight--when the same legal issues arise in connection with a different subject matter or different parties.
 
 
 55
 Although if pressed, we would designate the present situation as one involving res judicata, we think the choice of label is of little import. Under any of the tests commonly applied under either rubric, the issue which the Commission seeks to relitigate is one which is and ought to be closed. The facts of this case, the procedure adopted by the Commission, and the flouting of a decision on a statutory interpretation question decided by a court of competent jurisdiction all make this case a model for the application of preclusion principles.
 
 
 56
 FERC has cited to us the Supreme Court's relatively recent collateral estoppel decisions United States v. Mendoza, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), and United States v. Stauffer Chemical Co., 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). We find nothing in either of those decisions that supports the Commission's position. In Mendoza, the plaintiff sought to offensively estop the government with a district court decision that the government had failed to appeal. Noting the enormous volume of government litigation and the impossibility of the government's appealing every adverse judgment, the Court found that offensive collateral estoppel by a non-party should not be permitted against the government. The court noted, however, that "of course," the government "may not now undo the consequences of its decision not to appeal the District Court judgment in the [prior district court] case." As to the litigants involved in the prior case, "it is bound by that judgment under the principles of res judicata." Mendoza, 464 U.S. at 162, 104 S.Ct. at 573. The Mendoza court effectively responded to the Commission's asserted fears that the development of the law will be frozen. The Court stated:
 
 
 57
 The concerns underlying our disapproval of collateral estoppel against the government are for the most part inapplicable where mutuality is present.... The application of an estoppel when the Government is litigating the same issue with the same party avoids the problem of freezing the development of the law because the Government is still free to litigate that issue in the future with some other party. And where the parties are the same, estopping the Government spares a party that has already prevailed once from having to relitigate.
 
 
 58
 Mendoza, 464 U.S. at 163-64, 104 S.Ct. at 574. Indeed, where the parties are the same, the Court was willing to allow estoppel of the government even as to separable causes of action. Thus, in United States v. Stauffer Chemical Co., 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984), Stauffer was permitted to use a judgment won against the government with respect to one plant in litigation involving a second plant even though the two plants were located in different jurisdictions, and certain other factual details were different. The court found that estoppel was available to "preclude relitigation of the same issue already litigated against the same party in another case involving virtually identical facts." Id. at 169, 104 S.Ct. at 578 (emphasis added). The court noted that "the doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action." Id.
 
 
 59
 The Court, moreover, all but did away with the "unmixed questions of law" exception to the application of preclusion doctrine. The Court stated that "[a]dmittedly the purpose underlying the exception for 'unmixed questions of law' in successive actions on unrelated claims is far from clear" and was "frank to admit uncertainty as to its application." Id. at 172, 171, 104 S.Ct. at 579. The Court explained that the test for the exception seems to be "whether an 'issue of fact' or an 'issue of law' is sought to be relitigated" and then whether "the 'issue of law' arises in a successive case that is so unrelated to the prior case that relitigation of the issue is warranted." Stauffer Chemical Co., 464 U.S. at 171, 104 S.Ct. at 579 (emphasis added). The Court went on to observe that
 
 
 60
 "[w]hen the claims in two separate actions between the same parties are the same or closely related ... it is not ordinarily necessary to characterize an issue as one of fact or of law for purposes of issue preclusion.... In such a case, it is unfair to the winning party and an unnecessary burden on the courts to allow repeated litigation of the same issue in what is essentially the same controversy, even if the issue is regarded as one of 'law.' "
 
 
 61
 Stauffer Chemical Co., 464 U.S. at 171, 104 S.Ct. at 579 (quoting Restatement (Second) of Judgment Sec. 28, Comment b (1982)).
 
 
 62
 We think it amply evident that every consideration of equity, judicial economy, and consistency militates in favor of a finding of preclusion here. The parties all devoted enormous resources to litigating the municipal preference question energetically in Bountiful. They would have been far less likely to do so if they thought that the decision there was one that could be changed by the Commission at whim. The Commission itself represented to the Eleventh Circuit that its conclusion was entirely independent of and could not possibly be influenced by the facts of any particular relicensing case. The Solicitor General, in presenting his brief on behalf of the Commission to the Supreme Court, indicated that he and the agency believed that a denial of certiorari would give the Eleventh Circuit's decision binding effect as to the present parties. All the parties to this suit were parties to Bountiful, little time has passed and no material change in circumstances has occurred. The facts are not merely "virtually" the same. They are identical. It was precisely the municipal preference issue presented here that Clark-Cowlitz and Pacific Power were interested in when they intervened in Bountiful. We think it amply evident that as to the parties to Bountiful, FERC was not entitled to relitigate the municipal preference question.
 
 
 63
 We find disturbing, moreover, the Commission's suggestion that it is free to reinterpret statutes in any way it pleases without regard for precedent, and equally disturbing the hint that the Commission does not think itself in anyway bound by the actions of prior Commissions, let alone court decisions affirming those actions. Although we traditionally give agencies considerable latitude, agencies must use their interpretative discretion with some measure of constancy and reason. See American Trucking Associations, Inc. v. Atchison, T. & S.F.R. Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). Accordingly, we find FERC's contentions without merit, and conclude that the relitigation of this issue was barred by the doctrine of preclusion.
 
 
 64
 Our concurring colleague is correct in asserting that "saying that the Commission's new interpretation is unreasonable is different from saying that the Commission is precluded from asserting it." However, we continue to believe that the Commission is precluded from successfully asserting its new interpretation in this case with these parties. That the Eleventh Circuit deferred to the agency's statutory interpretation does not mean that the court did not also interpret the statute. The Eleventh Circuit specifically held, after an independent consideration of the statute and its legislative history, that the Commission's interpretation was correct. And we are required by the principles of res judicata to hold FERC bound by that interpretation.
 
 II. Municipal Preference
 
 65
 Even were we to find merit in FERC's arguments with respect to preclusion, however, we would be constrained to reverse. FERC's present interpretation of Sec. 7(a) of the Federal Power Act is unsupported by either the statute's language or its legislative history. Even giving FERC the deference normally accorded an agency's interpretation of its governing statute, the Commission's proffered reading would have to be rejected. In this case, moreover, deference is inappropriate because of FERC's startling departure from its clearly-established prior position based on purely internal discussions held at a closed meeting, without notice to any of the affected parties. Compare Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Clark-Cowlitz Joint Operating Agency v. Federal Energy Regulatory Commission, 775 F.2d 359 (D.C.Cir.1985).
 
 
 66
 The relevant section of the statute--7(a)--provides
 
 
 67
 In issuing preliminary permits hereunder or licenses where no preliminary permit has been issued and in issuing licenses to new licensees under section 808 of this title the Commission shall give preference to applications thereof by states and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted to conserve and utilize in the public interest the water resources of the region....
 
 
 68
 16 U.S.C. Sec. 800(a) (1982) (emphasis added).
 
 Section 808(a) provides:
 
 69
 If the United States does not, at the expiration of the original license, exercise its right to take over, maintain, and operate any project or projects of the licensee ... the Commission is authorized to issue a new license to the original licensee ... or to issue a new license....
 
 
 70
 16 U.S.C. Sec. 808(a) (1982) (emphasis added).
 
 
 71
 FERC seeks to capitalize on the "plain" distinction between "new" licensees and "original" licensees allegedly drawn in the statute. FERC contends that the use of these words clearly and unambiguously establishes that municipal preference applies only when the licensees in question are "new" and not when they are "original." We find FERC's interpretation strained to say the least. At most, the 'new/original' distinction highlights an ambiguity in the statute. When we turn as, under the circumstances we must, to the legislative history, Congress' intent is clear.
 
 
 72
 The Federal Power Act was the result of long years of intense controversy over the proper use and disposition of the nation's water resources. The battle lines between conservationists and public power on the one hand and private power interests on the other were clearly drawn in the early part of the century. The public power advocates saw the private interests as "power grabbers" who were "eager for plunder." Chemehuevi Tribe v. FPC, 489 F.2d 1207, 1218 n. 55, 1214-25 (D.C.Cir.1973) (quoting H.R.Rep. 1050, 62d Cong., 2d Sess. (1912)) (citations omitted). Many wanted the water power projects to be controlled exclusively by state and local governments or other public entities. Others, however, pointed out that few public entities had the financial resources to undertake water power development and that private parties could not be expected to commit substantial funds to projects that might be taken from them at will. The conservationists, led by Gifford Pinchot, battled long and hard against the private power industry. The industry, knowing how much was at stake, fought equally hard. In the words of the chief historian of the struggle, enormous funds were spent "to employ talented, persuasive, lobbying attorneys" and "[f]or ten years, tremendous pressure was brought to bear upon Congressmen by power companies." J. Kerwin, Federal Water-Power Legislation 8 (1926); see generally the extensive discussion in Chemehuevi at 1214-25. The struggle, moreover, was not confined to the substantive issues but became a major testing ground in the ongoing war between the advocates of states' rights and the advocates of centralized federal power.
 
 
 73
 The bill that eventually emerged from what Professor Kerwin has summed up as a "heated controversy" and a "prolonged and bitter" conflict (J. Kerwin at 7), was a compromise between the public interest in maintaining control of water power and the private interests in ensuring a reasonable return on investment.
 
 
 74
 In the words of O.C. Merrill, the man who drafted the bill and served as the Commission's first Executive Secretary, "the chief purpose" of the Federal Power Act was to "provide conditions under which capital can be secured [to develop hydropower] while at the same time fully to protect the paramount interests of the public in its last great national resource." O.C. Merrill, Benefits Accruing to Municipalities Through the Federal Water Power Act, The American City, Vol. XXIII, No. 5 (Nov. 1920), reprinted in J.A. at 272. To reassure private investors, Congress authorized long-term licenses (up to 50 years) and provided that if the federal government or any other private entity took over after the expiration of a license, the original licensee would be compensated in an amount equal to its net investment plus severance damages. The evidence is clear that, at the time, both Congress and the private utility industry considered these two provisions adequate to safeguard the legitimate interests of private power. For example, John A. Britton, then Vice President and General Manager of the Pacific Gas & Electric Company of California, testified before the Senate Committee on Public Lands as follows:
 
 
 75
 The CHAIRMAN. Now there will be a number of these--after the period begins to expire there will be a number of them every year; that is, if this bill passes, so many in 1970, so many in 1990--at the end of 50 years there will be a number of these contracts terminating every year; and I think it will be practically impossible to have an appropriation bill or a bill passed through Congress appropriating money to pay for these plants....
 
 
 76
 Mr. BRITTON. I am quite in agreement with you on that, but I think that at that time, 50 years from now, we will find that the Government itself will be very glad to take it over for the purpose of turning it over to a municipality, ... at the end of the 50 years the Government of the United States will elect to give that to the municipality. If it don't, it can permit Mr. [Henry J.] Pierce [President of Washington Irrigation & Development Company] to continue it or it has the right to give it to someone else.... The Government don't have to take it over ... but I do believe that most of these plants erected under these licenses, where they are applicable to a growing community, will be taken over by municipalities and operated by them, and not by the lessees.
 
 
 77
 * * *
 
 
 78
 The CHAIRMAN. But if the Government has to take it over it has got to pay him all it is worth.
 
 
 79
 Mr. BRITTON. Yes, sir.
 
 
 80
 The CHAIRMAN. Then that makes his bond good.
 
 
 81
 Mr. BRITTON. Certainly; there is no objection to that at all. The point is that these projects can be financed on a 50-year basis, and they are willing to accept at the end of 50 years, if the Government does not want to give it to them again, the value of the property. That makes the bond good....
 
 
 82
 See Hearings on H.R. 8716 before the House Committee on Water Power, 65th Cong., 2d Sess. 239-41 (1918) (emphasis added). The additional safeguard, which both FERC and the private utilities now desire--the safeguard of protecting the incumbent licensee from application of the municipal preference against it--was suggested but never adopted. Indeed, there was an unwillingness to even allow incumbents a preference as against competing nonmunicipal applicants. A proviso containing such a limited preference for incumbents was specifically deleted upon the insistence of the administration of President Woodrow Wilson.
 
 
 83
 In its original form the bill merely provided that:
 
 
 84
 In issuing licenses hereunder, the commission may in its discretion give preference to applications by States and municipalities....
 
 
 85
 H.R. 8716, 65th Cong., 2d Sess. Sec. 7 (1918). It did not distinguish between licensings and relicensings. Even in this vague original form, however, there was a general consensus that relicensings were as subject to the municipal preference as were original licensings. Although the bill went through a number of permutations, no one seemed to think that the changes effected any diminution in the scope of the municipal preference. On the contrary, the bill's drafter and the House Manager asserted that the bill gave municipalities a preference "both in the case of new developments [initial licenses] and in the case of acquiring properties of another licensee at the end of a license period." 59 Cong.Rec. 6527; cf. Bountiful, 11 F.E.R.C. (CCH) p 61,337 at 61,712-736 (June 27, 1980).
 
 
 86
 Some of the legislators voiced their legislative aims quite strongly:
 
 
 87
 Mr. WALSH. [T]here is no doubt in the world about the advisability of having these water powers owned and controlled, developed, and operated by the municipalities or by the States, if that is a practical proposition.
 
 
 88
 * * *
 
 
 89
 Mr. WALSH. If a private party and a municipality both are asking for a permit, the permit must be given to the municipality under the provisions of the bill.
 
 
 90
 Mr. BORAH. Is that mandatory?
 
 
 91
 Mr. WALSH. It is mandatory, as I understand from a reading of the bill. But if it is not I will agree with the Senator that it shall be made so.
 
 
 92
 Mr. BORAH. That is precisely what I want.
 
 
 93
 56 Cong.Rec. 10483-84 (1918).
 
 
 94
 The representatives of the private utilities also repeatedly indicated that they understood the bill to mandate municipal preference in all relicensing proceedings. See, e.g., Hearings on H.R. 8716 at 238-41 (Statement of John Britton, Vice President of PG & E). For example, the following exchange took place between a private power witness--E.K. Hall, Vice President of the Electric Bond and Share Company of New York--and a member of the House Special Committee.
 
 
 95
 Mr. CANDLER. Now then you do understand that under this bill the Government of course has the first right to retake the property?
 
 
 96
 Mr. HALL. Yes, sir.
 
 
 97
 Mr. CANDLER. Then do you further understand it that a provision of the bill further is that some of the licensees might be preferred over the first licensee?
 
 
 98
 Mr. HALL. The bill provides that; yes, sir. They can take it away and give it to somebody else.
 
 
 99
 Mr. CANDLER. Then the original licensee would have only the third opportunity to count on his lease.
 
 
 100
 Mr. HALL. That is the way I understand it.
 
 
 101
 Hearings on H.R. 8716 at 200.
 
 
 102
 In June 1919, Gifford Pinchot, the leading conservationist and advocate of public control, wrote the Chairman of the Senate Committee, suggesting changes:
 
 
 103
 The obvious intention of Sec[tion] 7, is to give preference to States and municipalities; and you will not be accomplishing this purpose surely, unless you insert after the word "issued" in line 11, page 12, of your bill, the words "and in issuing licenses to new licensees under Sec. 15 hereof", or words of like import.
 
 
 104
 Letter of June 25, 1919 from Gifford Pinchot to Senator Wesley Jones at 7, reprinted in J.A. at 213. Pinchot's suggestion was adopted.
 
 
 105
 In April 1920, O.C. Merrill prepared a special memorandum on the bill for the House Manager of the Conference Committee, Representative Lee. It stated, inter alia, that:
 
 
 106
 In the development of water powers by agencies other than the United States, the bill gives preference to States and municipalities over any other applicant, both in the case of new developments and in the case of acquiring properties of another licensee at the end of a license period.
 
 
 107
 Memorandum on Features of Public Interest in Water Power Bill H.R. 3184, Apr. 27, 1920, at 3, reprinted in J.A. at 254, 256. After the bill had been passed by both Houses and awaited only the President's signature, O.C. Merrill wrote in response to presidential inquiries:
 
 
 108
 For development by agencies other than the United States preference is given to States and municipalities. A similar preference is given for the acquisition of the properties of other licensees at the end of the license period.
 
 
 109
 O.C. Merrill, Memorandum [for President Wilson] on Water Power Bill H.R. 3184, June 9, 1920, at 2, reprinted in J.A. at 261, 262. The President signed the bill shortly thereafter.
 
 
 110
 In keeping with this history, both the earliest Commission and the courts in the 1920's when first called upon to hear cases relating to the act, interpreted the municipal preference as applicable across the board without reference to the identity of the incumbent licensee.
 
 
 111
 In response to the great mass of evidence supporting Clark-Cowlitz's interpretation, FERC can point only to one isolated comment by Congressman Sims, which, when stretched and taken out of the context of the rest of the dialogue, arguably supports its interpretation. Taken in context, as FERC itself explained to the Eleventh Circuit before it changed its mind, Sims' statement is simply not on point.
 
 
 112
 In short, the statute on its face may be somewhat unclear; but the legislative history removes any shadow of doubt as to what Congress wanted to happen when relicensing time arrived. The municipal preference applies to all relicensing including those involving an incumbent licensee.
 
 III. The Economic Impacts Analysis
 
 113
 As a purportedly independent and alternative basis of its decision, FERC argues that Clark-Cowlitz was not entitled to the license because the ALJ erred in determining that the two applicants were "equally well adapted." According to the Commission, Pacific Power should, in fact, be viewed as superior because of "broad economic considerations." These economic considerations consist of the relative costs to the current customers of each applicant if that applicant fails to obtain the license. What has been said above and in our companion case raises serious questions as to whether the determined, covert, and almost deceitful attack on the Bountiful policy may have so tainted the Commission's decision in this case as to render it a nullity. However, even if we indulge the Commission with every presumption of regularity of procedure, we find the merits of this holding fatally flawed.
 
 
 114
 We agree with Clark-Cowlitz that the Commission's position, if adopted, would render the statutorily-mandated Municipal preference a nullity. We cannot believe that Congress would have enacted a specific statutory preference with one hand and with the other given the Commission the power to disregard it at will. Indeed, we find numerous indications in the legislative history, such as the Borah-Walsh exchange quoted above, which indicate that Congress did not want the Commission to have discretion to meddle with or entirely undo the preference. We find especially specious the Commission's suggestion that because Clark-Cowlitz is eligible for federally-subsidized BPA rates, while a substantial percentage of Pacific Power's customers are not, that Clark-Cowlitz should not be permitted to take advantage of another federally-enacted benefit. By this reasoning, Congress' very consistency in preferring public entities becomes a justification for transferring benefits to private power. Such review of the wisdom or fairness of Congressional choices is beyond the limits of the Commission's power.
 
 
 115
 The Commission focuses on the statute's use of the phrase "public interest" as proof that Congress intended that the agency should have free rein to apply a "benefits" test of its own devising. As the Supreme Court has said, however, "the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the purpose of the regulatory legislation." NAACP v. FPC, 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976). It is clear from the statute that Congress never intended to authorize the standardless whatever-you-think-best analysis that the agency asserts is appropriate.
 
 Section 7(a) states:
 
 116
 The Commission shall give preference to applications therefore by states and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted, to conserve and utilize in the public interest the water resources of the region; and as between other applicants, the Commission may give preference to the applicant the plans of which it finds and determines are best adapted to develop, conserve, and utilize in the public interest the water resources of the region, if it be satisfied as to the ability of the applicant to carry out such plans.
 
 
 117
 16 U.S.C. Sec. 800(a) (1982) (emphasis added).
 
 
 118
 We think it is clear under the Commission's precedents that the judgment the Commission is authorized to exercise under Sec. 7(a) is a 'technical' judgment about the soundness and feasibility of plans. "[T]echnical" questions are "precisely that which the Commission exists to determine." United States ex rel. Chapman v. FPC, 345 U.S. 153, 171, 73 S.Ct. 609, 619, 97 L.Ed. 918 (1953); see also National Hells Canyon Association v. FPC, 237 F.2d 777, 779-80 (D.C.Cir.1956). The Commission's decisions have sometimes referred to "economic impacts" but the phrase has referred to economic feasibility, not to wide-ranging policy considerations as to the best allocation of profits and losses--in short, of wealth in this country.
 
 
 119
 The Commission's conclusion that economic losses to Pacific Power's customers are sufficient in and of themselves to declare applicants unequal and the preference inapplicable is particularly disturbing in light of the fact that it is self-evident that any change of license will involve at least temporary economic disruption and some shifting of benefits from the former licensee to its successor. To use that very shift as grounds for refusing to displace an existing licensee is to create an almost insurmountable preference in favor of the incumbent. The legislative history makes it abundantly clear that the length of the term and payment for property taken were the only entitlements given an incumbent licensee. Any other result would be anomalous in light of the fact that preventing private corporations from acquiring a permanent hold on water power resources was perhaps the single most important goal of the statute's drafters. The desire to prevent private power from acquiring permanent rights over the nation's waterways was, for example, the reason why a system of definite-term licenses was adopted. We think it is amply evident that Congress had no intention of giving FERC unbridled discretion to undo the preference system that Congress had so painstakingly established. To the extent that Congress granted FERC discretion, that discretion was limited to technical matters within the agency's expertise and did not extend to rendering legislative policy judgments about the national economy and the general welfare. Consequently, we find the interpretation given the words "public interest" by FERC untenable.
 
 
 120
 Our differences with our concurring colleague on this point may not be as great as they appear. We do not hold that the Commission is barred entirely from considering any economic losses to Pacific Power's customers. Such considerations, for example, might be appropriate in structuring the transfer of a license or in a case where the criteria for choosing between competing applicants had not been so clearly spelled out by Congress as they were here. In this case, however, where Congress has, so to speak, occupied the field, the commission went beyond its statutory authority.
 
 
 121
 Even if FERC's position were acceptable, however, its application of its "economic impacts" analysis to the present case would have to be reversed as arbitrary and capricious. The ALJ took substantial evidence on the potential economic impact and concluded that, in the long run, the ultimate effect of the costs and benefits was a "wash":
 
 
 122
 The relicensing of Merwin does not change the total requirements for or supplies of power in the Pacific Northwest, now or in the future, nor does it change the cost of such supplies. As PP & L's [Pacific Power] policy witness stated, Merwin, in effect, constitutes a power supply for all systems in the Pacific Northwest, and power generated at Merwin is available to any consumer in the region. The low cost BPA preference rate power to be released by JOA [Clark-Cowlitz] if it acquires Merwin will, in turn, provide savings to other purchasers from BPA by displacing their higher cost power. Part of such savings may return to PP & L through the N[ew] R[esources] rate. This "ripple" or displacement effect will tend to produce a "wash" of costs and benefits in the Pacific Northwest. If a final balance of cost burdens and benefits is not achieved within the Pacific Northwest as defined in the Regional Act, the displacement effect will spill over outside the region. Through PP & L or BPA, Merwin is interconnected via the Western Interconnected Systems with all major utility systems west of the Rocky Mountains. The net result of successive displacement of higher power costs would be to produce total dollar savings on the systems of the JOA members and those other systems benefitting from the released BPA preference power which would match the increased costs on the PP & L system. Taking the comparison of cost burdens and benefits to the ultimate impacts beyond the systems of PP & L and the JOA members conforms to a broad consideration of the full range of interests which would be affected by granting the license to JOA.
 
 
 123
 23 F.E.R.C. (CCH) p 63,037 at 65,110 (April 28, 1983) (citations omitted). The ALJ observed, it seems to us correctly, that "the 'public' whose interest the Commission should consider in its evaluation ... encompasses, at the very least, the full range of interests directly affected by its order." Id.
 
 
 124
 The Commission ignored this analysis and predicated its new and different decision on the likely economic impact on certain "segments" of the public. The Commission provides no explanation as to why it focuses on "segments" rather than on consumers as a whole. Further, the Commission places considerable emphasis on the likelihood that the increase in costs to Pacific Power customers as a group would be greater than the savings effected by Clark-Cowlitz customers as a group but fails to note that since the two customer groups are of different size the increased costs likely to be sustained by individual Pacific Power customers were small compared to the savings likely to be effected by individual Clark-Cowlitz customers. As applied, the economic impacts analysis is entirely arbitrary and in conflict with the statute's underlying policies.
 
 CONCLUSION
 
 125
 This case, ostensibly, is a dispute between two applicants for a hydropower project in the state of Washington. However, the stakes are and have been substantially greater than the identity of the successful applicant for the Merwin project. At stake is the vitality of a Congressional decision favoring municipalities in the operation of hydroelectric power plants. That municipal preference question, at the core of this controversy, was extensively litigated and definitively resolved as to these parties in the Bountiful proceeding. At issue here, therefore, is the constancy, not only of an agency's decisional process but of the federal reviewing courts as well. To uphold the Commission's decision in this case would declare the doctrine of preclusion totally inapplicable to this agency. Even aside from that, we think it amply evident that the statutory interpretation argued for by petitioner Clark-Cowlitz is correct. Finally, we find that the Commission's attempt to import broad-ranging national policy considerations into the phrase "public interest" under the rubric of "economic considerations" exceeds its authority and is impermissible.
 
 
 126
 Congress labored long and often to establish a public power policy for this country. The monumental political battles which took place over this issue reflected the wiliness and determination of powerful adversaries with strongly held views. Every aspect of the statute that finally emerged was repeatedly and hotly contested. It is not for FERC to rewrite that history or the resulting statute. Nor can points lost in the legislature and then in the courts be won in the same courts by the simple expedient of repetitious litigation. The Commission erred in overturning the ALJ's initial decision, and his award of the license to petitioner Clark-Cowlitz. Accordingly, we reverse and remand to the agency with directions to reinstate the initial award in favor of Clark-Cowlitz.
 
 
 127
 It is so ordered.
 
 
 128
 J. SKELLY WRIGHT, Circuit Judge, concurring in part:
 
 
 129
 I am substantially in agreement with the majority opinion, especially with respect to the principal issue, the construction of the municipal preference. I write separately, however, to make clear my analysis of the case.
 
 
 130
 Judge Mikva's discussion of res judicata and collateral estoppel is a lucid and scholarly exposition of a confusing and difficult area of law. However, I find myself unable to accept the predicate for its application to this case--that the Eleventh Circuit "did not uphold the Commission's interpretation because it was one reasonable interpretation among many. Rather, the court applied a much stricter standard of review to the agency decision and held that the other interpretation being urged was clearly wrong." Majority opinion at 372.
 
 
 131
 As I understand the Bountiful litigation, the Commission had interpreted the municipal preference statute, and the private license holders were challenging that interpretation. The Eleventh Circuit applied a deferential standard of review, noting that it should uphold the agency's construction "unless there [were] compelling reasons indicating such construction is wrong." Alabama Power Co. v. FERC, 685 F.2d 1311, 1316 (11th Cir.1982) (citing Florida Power & Light Co. v. FERC, 660 F.2d 668 (5th Cir.1982)); see also id. at 1318, citing CBS, Inc. v. FCC, 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1982). The court found that FERC's initial interpretation was reasonable. Therefore, any challenge to the reasonableness of that interpretation by the parties to Bountiful would certainly be precluded. But Clark-Cowlitz is not challenging the reasonableness of that initial interpretation, it is challenging the Commission's revised interpretation. It may be difficult to imagine how two directly opposite interpretations can both be reasonable, but saying that the Commission's new interpretation is unreasonable is different from saying that the Commission is precluded from asserting it.
 
 
 132
 The posture of this case is admittedly somewhat unusual. Intervention by virtually all the affected parties has converted a proceeding that is adjudicatory in form into one that is effectively a notice and comment rulemaking. We should be extremely reluctant to apply collateral estoppel to this hybrid procedure in a way that enables an agency to bind the policy decisions of future generations.
 
 
 133
 In any event, my differences with the majority on the question of preclusion only make it that much easier for me to reach the merits of the municipal preference issue, and on this point I am in unqualified agreement with the majority opinion. There is no doubt that Congress intended the preference to apply on relicensing and that the Commission's revised interpretation of the statute is not a reasonable one.
 
 
 134
 With respect to "economic impacts," I would allow the Commission greater latitude than does the majority. I think the "public interest" easily comprehends consumer cost inequities. Nor do I believe this analysis necessarily undercuts the municipal preference, which when properly applied is merely a tiebreaker. I share the majority's concern about the potential for abuse, but that only means that we must be especially careful to scrutinize the Commission's application of the test, not that we hold it impermissible as a matter of law.
 
 
 135
 In this case, for example, the Commission's decision was so incompletely reasoned and explained as to be arbitrary and capricious. In particular, the Commission did not justify its failure to examine the economic impact on the entire region, as the Administrative Law Judge had done, rather than merely the customers of the competing applicants. I do not conclude that the Commission must adopt the ALJ's approach, but at least it must present some evidence that it considered this seemingly plausible alternative and rejected it for legitimate reasons. I would remand the case for that consideration.